245 P.2d 962

In re WILSON.

WILSON v. FLACCUS.
No. 5448.

Supreme Court of Arizona.
June 30, 1952.

Lewis, Roca & Scoville, of Phoenix, for appellant.

Frank Beer, Kenneth Scoville, and Arthur T. LaPrade, Jr., of Phoenix, for appellee.

DE CONCINI, Justice.

This case involves the custody of a minor, aged six and one-half years, Christopher William Wilson III, known as Bill. He is the natural son of the parties hereto.

The appellant and father, Christopher William Wilson, Jr., is a lawyer and was the petitioner in the trial court for a writ of habeas corpus. The respondent, Nancy Patterson Flaccus, nee Wilson, the mother, successfully resisted the writ below. Petitioner brought this appeal on the ground that the lower court abused its discretion in awarding Bill to the mother in the light of the evidence adduced before it.

The background of the family relationship is somewhat as follows. The parties were married in June of 1939. They had

two children, Nancy, a daughter born in March 1941, and Bill born in May 1943. The parties were incompatible. In June of 1947, the respondent left the home of the parties in New York with the children and stayed with respondent's mother in Pittsburgh. In August 1947, the parties entered into a separation agreement, settling their property rights and dividing the custody of the children, whereby Nancy was given to the father and Bill to the mother, subject to the rights of each parent to have temporary custody of both children during a three-weeks' period each summer. In September 1947, respondent proceeded to Charlotte Amalia, Virgin Islands, where she remained seven weeks. She was there granted a divorce. The court adopted the separation agreement and recognized the provisions for divided custody of the children.

In January 1948, respondent married Bliss Flaccus in Pittsburgh. The following day they left for Phoenix, Arizona where they were living at the time of the hearing on the writ. At the time of the hearing one child had been born as an issue of this marriage. In June 1948, petitioner married a widow with two children about Nancy's age.

The appellant raises three assignments of error on the ground that the court abused its discretion in awarding the child to the mother, in that:

1. The mother was unfit to have custody of the child;

2. The order of the trial court was against the best interest of the minor, and

3. The father was best fit to have custody of the minor.

Respondent admits that appellant is a fit and proper person to have custody of the child, but denies that she is unfit for that purpose.

The trial of this matter consumed many days. There are 1350 pages of the Reporter's Transcript, and approximately 400 pages of depositions. The latter were taken from across the length and breadth of the United States. In addition there are a number of letters, pictures and other exhibits. All of the foregoing have been minutely examined by the court. The record is full of conflicting testimony and sprinkled with a big dose of bias and prejudice on the part of many of the witnesses.

It would uselessly lengthen this opinion to quote even a portion of the testimony. One cannot read the testimony of some of the witnesses without becoming incensed at the treatment accorded to Bill by respondent; yet when one reads the contradictory statements made by other witnesses the aroused feelings subside. Briefs of counsel are of the same character. After reading appellant's opening brief we are reminded of the learned justice of the peace, who upon hearing the plaintiff's side of the case in his first trial exclaimed, "The plaintiff wins!" Upon reading the respondent's brief we revert to the story of the justice of the peace. The defendant

in the story objected to the J. P.'s quick judgment and asked leave to put on his side of the case, which was granted. Upon hearing the defendant's case, the J. P. leaned back, drew a long breath and said, "Well I'll be dogged, the defendant wins."

In this case, both the testimony and briefs are of a like nature. If one believes the appellant's side, the trial court erred, but if one believes the respondent's side the court was justified in its decision. That there is a conflict as to the treatment of Bill, there is no question. This is true whether the testimony was from interested parties, domestic servants, doctors or psychiatrists. One of the latter termed Bill a problem child as far as behavior was concerned. The other, that he was a boy with a problem. Admittedly he was one or the other, or both. Most of the witnesses termed him an endearing child.

This court has said times without number that the trial court who had the opportunity to see, listen and gauge the demeanor of the witnesses on the stand is the best judge of conflicting testimony. If there is any reasonable evidence in the record to sustain the judgment this court will not disturb it.

The judgment of the lower court is affirmed with the exception that, in addition to the usual visitorial rights, the decree be modified in that the appellant be permitted to have the custody of Bill three weeks each summer as the parties agreed in their original separation agreement. This modification we believe to be for the best interest of the child.

Affirmed as modified.

UDALL, C. J., and LA PRADE, J., concur.

PHELPS, Justice (specially concurring).

I most reluctantly concur. I do so because there seems to be no other course. This court is bound by the judgment of the trial court based upon conflicting testimony. There are some facts in the case, however, about which there is no dispute which I feel impelled to set forth. For example the strict schedule concerning the habits of Bill (who was then six to six and a half years of age) produce violent rebellion in my heart. He was required to arise exactly at a given hour each morning; he was allowed exactly 30 minutes to dress himself and appear at the table for breakfast; Bill was not permitted to eat with the family but had to eat in the servants' quarters alone; he had to eat the food given him by the cook; he had to eat all the food served; he had to do this within 30 minutes; if Bill failed to reach the table within 30 minutes or one or two minutes thereafter he did not get any breakfast at all; if he failed to eat all of his food it was held over for him from meal to meal during the day and he had to consume the left-over food before he was entitled to any other. This schedule applied as well to other meals except that left-over food was not carried over until

the next day. If he violated one of the many regulations by which he was circumscribed he was locked in a closet or in the boiler room. Witnesses for the mother testified he was kept there not over 45 minutes, and testimony for the father was to the effect that he was often kept there three hours. Bill was not allowed in the living room of the house alone at any time. For an infraction of this or other regulations he was locked in the dark closet in the home located near Phoenix. This occurred even in July and August. He was put in some kind of harness at night when he was placed in bed which prevented him from sitting up in bed and according to one of his nurses he could not even get off his back the entire night. He was required to go to the bath room to urinate before retiring and under orders of the mother was not allowed to go again during the night regardless of necessities. The nurse testified she ignored this regulation.

Bill was placed in a military school in California when he was six to six and a half years of age. He was removed from that institution by his father on a writ of habeas corpus just prior to the trial of this cause.

I recognize that children do not all respond alike to the same treatment and there is a wide divergence of opinion concerning what methods should be employed generally in disciplining small children to get the best results. Therefore although the treatment above outlined appears to me to be cruel and even brutal and leads me to believe it was not for the best interests of this child, the trial judge found otherwise, based in part upon the testimony of the mother, supported by other witnesses to the effect that she loved Bill and did many things which indicated a motherly affection for him.

Under the circumstances I feel bound to concur.

STANFORD, Justice (dissenting).

The majority opinion takes the easy way out by following the rule of stare decisis. The opinion in this case rendered by the trial court has the following:

"The law of our state is committed to the rule that, other things being equal, a child of tender years should be given to the mother."

Neither the opinion of the trial court nor the opinion rendered by the majority of this court has said one thing about the matter that caused this action of habeas corpus to be brought by the father of this child, and that is:

Bill, the child, was enrolled in the Elsinore Military Academy in California on September 11, 1949. He was then of the age of six years plus. The respondent, Mrs. Flaccus, did not leave Phoenix for Pittsburgh that fall until October 9, 1949. Everything would indicate that the child had been placed there for a considerable length of time and everything points to the fact that this respondent forfeited her

right, by that act, to have the custody of this child during his tender years.

The oddity of the majority opinion is that it states:

"It would uselessly lengthen this opinion to quote even a portion of the testimony."

The opinion further states:

"This court has said times without number that the trial court who had the opportunity to see, listen and gauge the demeanor of the witnesses on the stand is the best judge of conflicting testimony."

The fact of the matter is, the theory of the majority opinion in this case establishes the rule that hereafter in all such cases there would be nothing to gain by any litigant taking an appeal to this court.

I think the custody of the child should go to the father. The evidence is uncontroverted that he is a fit and proper person to have the custody of the child. Respondent admits that fact in her response to the petition for writ of habeas corpus, from which I quote:

"The respondent admits the petitioner is a fit and proper person to have the care, custody and control of said minor child."

I say the custody of the child should go to the father in view of the fact that had respondent's treatment of the child not been questioned by the father, the child would today be in a military home instead of the home of either parent. If respondent had intended to give the child a proper homelife she would not have sent him away to a military school; therefore I am forced to dissent from the majority opinion.