264 P.2d 835

TANG et al. v. AVITABLE.
No. 5675.

Supreme Court of Arizona.
Dec. 14, 1953.

Hugh M. Caldwell, and Conner & Jones, Tucson, for appellants.

Darnell, Robertson & Holesapple, and Thomas Chandler, Tucson, for appellee.

UDALL, Justice.

Anthony G. Avitable, plaintiff (appellee), sought to recover damages from copartners Joe W. Tang, Joe Y. Wey, and Sam Dong, for the breach of a contract to sell a night-club business. The cause was tried to the court without a jury and plaintiff was awarded $32,300 in damages. The partners perfected this appeal and raise several interesting questions of law. For convenience we shall refer to the parties by their last names.

The trial of this case lasted some three days; the reporter's transcript covers 588 pages and there are numerous exhibits. Our task in preparing the opinion in this involved matter has been greatly facilitated by the excellent briefs filed by counsel for the respective parties. As to various

phases of the case the evidence is in sharp conflict. On appeal, however, it is our duty to view the facts in the light most favorable to sustaining the judgment of the lower court, and stated in this light, the material facts are as follows:

Tang, Wey, and Dong, as partners, owned a nightclub business called the "Flamingo Club", in Tucson. Tang was the active partner and represented the partnership in all its transactions with third parties. On May 10, 1948, Philip R. Vetari by written contract purchased this business from the partners.

The agreed sale price was $40,000. Vetari paid $5,000 cash, transferred a piece of real estate agreed to be worth $7,000, assumed an installment loan contract in the sum of $5,000 owed by the partners to the Southern Arizona Bank & Trust Company, and executed a $23,000 promissory note payable eighteen months from date with interest at 6% payable monthly. The note was secured by a mortgage on the business and all of its assets. Vetari went into possession of the premises as sublessee of Tang, who was lessee of Ivancovich, the owner. Vetari spent more than $11,000 for repairs and capital improvements. By January, 1949, for unexplained reasons, Vetari was in dire financial circumstances and in default under many terms of his contract of purchase.

Tang instructed Glenn Ginn, a Tucson attorney, to proceed to forfeit Vetari's rights under the contract. Vetari engaged Frank Watkins, another Tucson attorney, to represent him in a series of negotiations with the partnership designed to arrive at some workable, reasonable and fair settlement of the financial problems. These negotiations culminated in a written contract dated April 21, 1949.

Under this contract the parties intended that Tang should go into possession and operation of the business in an undefined capacity: (1) Tang would enter as owner, declaring a forfeiture of whatever rights the purchaser had acquired by his payments, but, (2) if during the ensuing 18 months Vetari paid his accrued defaults he should have the right to take back the business as owner, in which event Tang would be treated as having entered as a creditor, not as owner, operating the business for the purpose of realizing a profit to be applied to the satisfaction of Vetari's debts. The whole gross income from the business would then be treated as Vetari's, Tang would receive some reasonable compensation for his personal services, and an accounting would be had from Tang to Vetari to determine the amount still due upon the undefaulted obligation (the $23,000 note).

The agreement provided Vetari should execute promissory notes due one year from date, to cover his accrued defaults on rent, the bank loan, interest payments on the $23,000 note, $888 on a collateral liquor purchase contract, and smaller amounts on

utilities and prorated insurance. These accrued defaults totaled approximately $6,-000.

As security for payment of the newly-executed promissory notes, Vetari assigned to Tang a $24,000 note he owned which was secured by a mortgage on Tucson real property. Furthermore, Vetari executed an option whereby he granted to Tang the right to purchase the $24,000 note for about $6,000 less than the face value thereof.

In the agreement of April 21, 1949, there is the following paragraph:

"7. That within the eighteen (18) calendar months from the date hereof the said Buyer-Lessee (meaning Vetari) shall have the right to purchase ·back said business at a price equal to the original purchase price agreed to by the Sellers and the Buyer-Lessee on or about May 10, 1948, less intervening credits, Provided also that all the promissory notes mentioned in this agreement are fully paid by the Buyer-Lessee in the manner provided therein."

The notes referred to in the *proviso* were those executed to cover the accrued defaults. They were all paid by Vetari on May 7, 1949. Several preliminary attempts were then made to "alert" Tang that Vetari was going to step back into the operation of the business; and about October 1 there was a conference in the offices of attorney Watkins, between the latter, Vetari, and Tang. Watkins informed Tang clearly and unequivocally that Vetari was exercising his option. Tang demanded $10,500 cash to cover claimed operational losses and other items of alleged indebtedness before he would permit Vetari to take over the business. However, it is clear that Tang was not entitled to any amount in cash, because Vetari, according to the trial court's accounting, was entitled to a net credit of at least $17,300, and the balance of approximately $23,000 due Tang was to be represented by a note. The demand, therefore, was wholly unjustified. Mr. Watkins informed Tang that his demands were "ridiculous", but Tang was adamant, insisted that he receive the cash, and walked away.

At this time Vetari was indebted to Avitable, plaintiff-appellee here, in the sum of $12,000, and on December 15 assigned to him whatever rights he, Vetari, had against Tang. Avitable talked to Tang who demanded $33,000 cash, apparently no note from Avitable would be acceptable, before the latter would be permitted to take over the operation of the Flamingo Club.

Avitable brought this action upon the theory that Tang had breached a contract of sale between Tang and Vetari, to the latter's damage in the sum of $32,300, and that Avitable, as assignee of Vetari, was entitled to prosecute the action. The judgment of the lower court in the sum of $32,-300 was entered in favor of Avitable, and defendants appeal.

█ We hold that after Vetari paid the $6,000 in arrears and declared he wanted the business restored to him, Tang was thereby put in the position of having entered ab initio as creditor and not owner, pursuant to his mortgage, and with the consent of the mortgagor, and that he thereby became what the law terms a "mortgagee in possession", blessed or afflicted with all the incidents the law attaches to such a position, except insofar as he and his debtor had by contractual stipulation changed those incidents.

█ Normally, the mortgagee in possession is entitled to retain his dominion and control of the "true pledge" until the debt is fully paid, being liable for strict accounting of the income of the property, and bearing any loss himself. On this general subject, see 14 C.J.S., Chattel Mortgages, §§ 185–188; Jones, Chattel Mortgages and Conditional Sales, Bowers Edition, §§ 696–697a.; Glenn on Mortgages, Vol. 2, Chapter 18; Osborne on Mortgages, §§ 160–173. Certainly here the right of repossession was contractual in nature to the extent that the written agreement provided the debtor could repossess upon payment of the accrued defaults. Perhaps use of the term "repurchase" to describe the debtor's rights is not strictly apropos, but there is no strong magic in words, and it suffices that we understand the debtor could pay approximately $6,000 to cover his arrears, then ask to be put in possession under the terms of his original purchase contract.

The creditor would then render an accounting, ascertain the balance due upon the $23,000 indebtedness, a new note would be executed reflecting the unpaid balance, and the same would be secured by a mortgage on the business and its assets.

The legal purist may insist there was but one contract, that of April 21, and that the "option" to retake the business upon payment of the notes was but a provision therein, and that an unequivocal declaration of intent to retake was not acceptance of some standing offer, but only the exercise of a legal right bargained for in the contract. The practical result is the same, here we have a debtor who has invested large sums in a business, and a creditor who has both the money and the business and refuses to relinquish either.

█ There is some question raised whether the contract of April 21, 1949, or the option clause therein, was supported by consideration. In the law of contracts, an option is but a contract to keep an offer open, 17 C.J.S., Contracts, § 100 (e), and when there is no claim that the offer was revoked or expired, it is somewhat idle to discuss why it was not revoked. However, if consideration be insisted upon, certainly the debtor forebore several legal rights, the right to insist upon foreclosure and sale instead of the creditor arrangement, the right to escape liability for losses occurring during the creditor's operation; he agreed to pay accrued defaults, whether or not Tang's repossession would eventually re-

sult in forfeiture of his interest in the business; he gave additional security for the debt, and gave the creditor the legal right to purchase a note at a discount from its face value. The trial court could properly find that any one or all of these furnished the quid pro quo for the contractual obligations assumed.

■ Error is assigned as to the conduct of plaintiff's attorney in bringing to the attention of the trial court the fact that a felony charge growing out of an alleged liquor law violation was pending against defendant Tang in the United States District Court during the early part of 1949. The first time the fact that such charges were pending came into evidence, no objection nor motion to strike was made. A party must protect his record, and failure to object is waiver of error, see Bruno v. San Xavier Rock & Sand Co., decided November 9, 1953, but not yet reported.

■ Later, counsel for plaintiff went into the matter of the negotiations of Tang and Vetari preceding the execution of the contract of April 21. An examination of such negotiations is material because it enables the court more clearly to ascertain the intent of the parties and give a proper construction to their written contract, see Hamberlin v. Townsend, 76 Ariz. 191, 261 P.2d 1003; Branker v. Bowman, 62 Ariz. 214, 156 P.2d 898. Over defendants' objection that it was immaterial, counsel elicited from witness Watkins the answer that during these negotiations Tang, or his attorney on his behalf, had stated Tang was under indictment for felony and faced a possible prison sentence, and that any agreements between the parties would have to be prepared with this fact in mind. In the light of the above rule, the objection of immateriality was not well taken.

■■ The record discloses that in addition to the purpose of ascertaining the intent of the parties, the evidence was offered for the purpose of impeaching Tang, not as character impeachment but upon the theory that what he said during these negotiations was contradictory to some of his testimony on the stand. This is impeachment on a material issue by showing a prior self-contradictory statement, and as such is admissible, see Posner v. New York Life Ins. Co., 56 Ariz. 202, 106 P.2d 488; Shaffer v. Territory, 14 Ariz. 329, 127 P. 746. By failing to object, defendants waived any question of lack of foundation for impeachment. Cf. Tamborino v. Territory, 7 Ariz. 194, 62 P. 693, affirmed on rehearing, 7 Ariz. 246, 64 P. 492. The evidence was properly admitted for the purposes for which it was offered, and we see no merit to the claim of impropriety in the conduct of counsel in offering the evidence.

■ It is next contended the court erred in finding that Vetari, acting through his attorney, Watkins, exercised the option to retake the business, for the reason that there is no substantial evidence to support such a finding. The record is replete with

testimony that the option was exercised unequivocally and unconditionally by Watkins on behalf of Vetari, during the negotiations in Watkins' law office, at some time during the last week in September or the first week in October, 1949. It is the rule that this court does not weigh conflicting evidence to determine its preponderance upon a disputed issue of fact. We are concerned only with whether facts do exist which support the action taken in the lower court. See In re Wagner's Estate, 75 Ariz. 135, 252 P.2d 789; Wilson v. Flaccus, 74 Ariz. 197, 245 P.2d 962. The evidence in the record will support the finding, and it follows that the lower court did not err in making such finding. It follows there is no merit to the claim Avitable should have exercised the option. His assignor had done it for him, and the rights accruing therefrom were assigned to him.

Appellants contend that even though the option to retake was exercised, the contract of April 21, 1949 required further lengthy negotiations of the parties in connection with material conditions of the contract formed by the exercise of the option. Basically, this is the contention that the cost provisions in the option clause are so vague as to be unenforceable. We disagree. This contract is drawn in the light of the original purchase contract, and any retaking is to be pursuant to the terms of the latter, provided only that the notes executed to cover the accrued defaults be first paid. The term "less intervening cred-

its" as used in this context is not so vague and ambiguous as to render the whole agreement void. The term simply refers to the fact that the creditor was to account to the debtor, if the option to re-enter was exercised. A proper construction of the whole of paragraph 7, supra, warrants the interpretation placed on it by the trial court that after exercise of the option the matter of arriving at the repurchase price was simply one of mathematical computation. No further negotiations or agreements were needed, Tang's duty to account being a matter of bookkeeping, not negotiation.

Vetari's failure to tender "performance" to Tang cannot help defendants. Vetari's performance would have consisted in the execution of a substitute note with a smaller principal sum to take the place of the $23,000 note originally executed, and the execution of a new mortgage on the business to secure the note. Without the accounting which Tang refused to give, the face amount of the new note was unknown. The figures were in Tang's possession, not Vetari's. We believe Tang's conduct constituted repudiation of his obligations, and rendered impossible any further tender of performance upon the part of Vetari or Avitable.

It is further objected that Watkins, acting as attorney for Vetari, should not have dealt directly with Tang, particularly in view of the fact that Watkins had previously represented Tang on another legal matter. There are two serious defects in the

claim that this has any bearing upon the decision of this case. In the first place, at the time Watkins dealt with Tang the latter was not being actively represented by any counsel. Mr. Watkins could not have engaged an attorney for Tang, and his only alternative would have been to wait until Tang engaged one himself, an event which might never transpire. In the second place, the "dealing" Watkins had with Tang was simply to inform him the option was exercised, and this was but a communication of fact. There matters stopped, for Tang was the one who refused to fulfill his obligations under the contract. This cannot be tortured into a violation of confidence, nor an advantage taken of Tang.

■ Appellants claim no evidence supports the finding that at the time the option was exercised the business had a reasonable market value of $55,000. However, Vetari had estimated the value to be from $55,000 to $60,000; the original sale price was $40,000 and Vetari spent over $11,000 for improvements. Tang claimed to have spent $10,000 more for improvements, although the trial court must have found that figure to be highly inflated. The liquor license alone was worth $15,000 to $20,000. Moreover, after having received $17,300 from Vetari, Tang demanded $33,000 more from Avitable, before he would relinquish control of the business. We hold there was a sufficient basis for the finding of the court as to the value of the business.

There is the contention that the facts do not justify the damages awarded, and this is correct in part. After hearing the evidence on Tang's operation of the business, the lower court allowed some items, disallowed others, and finally struck a balance, deciding that Vetari was entitled to $17,300 credit for payments to Tang or on his behalf. This amount, we believe, is excessive by $2,240.

■ On October 1 when Vetari elected to re-enter, he had paid $2,760 on the $5,000 obligation at the Southern Arizona Bank & Trust Company, and the unpaid balance was $2,240. Tang paid this balance, not Vetari. For the purpose of being entitled to retake the business, assumption of liability for the $5,000 obligation sufficed, for the same reason that the assumption of liability on the $23,000 note sufficed: Tang was extending credit. But, for the purpose of awarding damages, the bare assumption of liability to the partnership is not enough. Whether or not Vetari was ever liable to the bank on a third party beneficiary theory, the fact remains that the partnership paid the bank $2,240 and therefore Vetari is not to be credited with this amount.

■ From the evidence it appears that Vetari's loss of bargain was $15,000, the difference between the agreed sale price of $40,000 and the market value of $55,000. Vetari's payments to Tang totaled $17,300 less the $2,240, or $15,060. It is not unjust that the injured party should take as com-

pensation the damages sustained by loss of his bargain, together with all moneys paid for what he never received. The $15,000, together with the $15,060, totals $30,060, which is the amount of damages the lower court should have awarded. We point out that the $11,000 expended by Vetari for improvements is reflected in the $15,000 awarded for loss of bargain. As *corroboration* that the damages are justified, we point out that Vetari's out-of-pocket expenditure was more than $26,000, for which he received nothing in return.

While Tang was managing the business he bought certain items of equipment, to-wit: two Chinese stoves, a beer cooler, and some neon signs. He purchased these on time payments, and at the time the action was brought the balance due was approximately $1200. It is claimed that Vetari's damages must be reduced by this amount, apparently upon the theory that the value of these improvements is reflected in the $55,000 evaluation of the business, and that Vetari's obligations should be increased by $1200, so that his loss of bargain is only $13,800, instead of $15,000.

But, Tang was mortgagee in possession, and the authorities all agree that he may not improve the mortgagor out of his estate. It was therefore defendants' burden to prove the affirmative of the issue that these improvements were consented to by Vetari or were made as necessary repairs for the proper operation of the

business. See 14 C.J.S., Chattel Mortgages, supra; Glenn on Mortgages, supra; Osborne on Mortgages, supra. The lower court made no finding upon this point. As we stated in Kubby v. Hammond, 68 Ariz. 17, 198 P.2d 134, 137:

"Where findings of fact have not been made the rule is that the judgment should be affirmed if there is any theory of the case upon which such judgment can be sustained and any reasonable evidence in the record supporting such theory. (Citing cases.)"

The evidence does not compel the finding that the improvements made by Tang were necessary, or consented to by the mortgagor, and it follows that the lower court's action in failing to allow credit for this item must be upheld.

There are a few other minor points raised, and some minor conflicts in the findings of the trial court. But, it would unduly extend the length of this opinion to treat with these matters in detail. Suffice it to say we have carefully examined all of them and find they do not change the result herein.

The judgment entered is ordered reduced by the item of $2,240, supra, and as so modified the judgment is affirmed, appellant to recover his costs in this court.

STANFORD, C. J., and PHELPS, LA PRADE and WINDES, JJ., concur.